Owen, J.
As a majority of the court is unable to agree upon the question of the jurisdiction of the court to hear and determine any of the matters declared upon in the petition, and to grant any relief in the form prayed for, we proceed to a consideration of the several matters heard and adjudged by the court below upon the issues of fact — assuming, without deciding, that jurisdiction was acquired by the averments of the petition.
1. It is assigned for error that the court below excluded from its count two hundred of the votes which appeared by the returns from precinct A, of the 4th Ward, to be credited to the Democratic candidates for senator from Hamilton county. In this return, over three hundred names purporting to be those of voters were upon sheets of foolscap paper folded within the poll-book furnished to the canvassers, and which was numbered to contain only 654 names. These sheets were in no manner attached to the poll-book. They are not authenticated by the signature of any judge or clerk of the election. The poll-book was full, and the last name upon it was numbered “ 654.”
The record shows that the same form of poll-book was furnished to the election officers of each precinct of the county, and was prepared to contain only 654 names; the attempt having been made to subdivide the precincts so that no precinct should contain more than six hundred voters. This precinct had not been so subdivided.
The names of voters were continued from the regular poll-book upon the loose sheets; the first name upon it being numbered 655, and in the same handwriting as the last names on the poll-book. These names, to the number of 697, are continued in the same hand, and that is evidently that of one of the clerks of the election. Erom this they appear in another handwriting to the number of 796, when the entry of names is resumed by the clerk and continued to the number of 996.
These sheets were found folded within the poll-book when opened by the canvassers. That these sheets were *656 entitled to be regarded as part of the poll-book is supported by the authority of Clarke v. McKenzie, 7 Bush (Ky.), 524, where precisely the same question arose. Controversy on this point is settled, however, by the fact that the coui’t below treated it as part of the return and counted over one hundred votes, representing as many names upon it.
It is further claimed that this return should not be canvassed, for the reason that there are upon it a large number of unusual names and an unusual number of like names. That it is the duty of tlie canvassers to look to the names upon the return and reject it for the reasons indicated; and by what test, as to number or peculiarity of names, a return is to be condemned as spurious, are propositions upon which we are left without light. It appears from this return that, in the footings of tallies for each of the Democratic candidates for senator, there was at one time the number of 726, and that this has been changed, in the cases of three of these candidates, to 926. It is claimed that this should and does condemn the entire return as false and spurious, and that it should be rejected entirely, or at least that the two. hundred votes involved in this change should be rejected.
The following is a facsimile of the figures as changed:

The number 726, originally appearing in the above footing of the tallies, together with the votes credited in the footing to the opposing candidates, aggregated 796 votes. Wheu this number of names of voters was i-eached on the poll-books, the record of names was resumed in another handwriting (being plainly that of the clerk of election who began the record), aud was continued in the same hand to the number of 926. This number corresponds with the tallies; and, if the return, was a valid one, it was the clear duty of the canvassers to change the footings to correspond with the tallies. Where the count is kept by *657 tallies, the number of them will prevail over an incorrect footing in figures. In such case the footing would be a mere clerical mistake appearing upon the face of the return, and subject to correction by the canvassers. This was distinctly held by Minshall, J. (a member-elect of this court), in Esker v. McCoy, Ross Common Pleas, 6 Am. Law Rec. 694.
Several candidates upon the state ticket with these senatorial candidates were credited with but 726 votes each, in both tallies and footings. There is no break in the rccqrd of tallies at the point where it is claimed additions were begun. It is asserted in argument, that the names of the judges signed upon each page of the returns are in the same handwriting. This does not seem to be borne out by inspection of them. There seems to be at least the handwriting of two different persons exhibited in the three names. There is no question but. that the signatures of the two attesting clerks are genuine. There are features of this return which justify a strong suspicion that, if there was not behind it and in the preparation of it actual fraud and crime, there was at the best a reckless trifling with official doty, and with the rights of the honest voters of the precinct, as odious as actual fraud and as dangerous as crime. But this remains to be said of this return and for the canvassers who were called upon to deal with it. It came to the hands of the canvassers inclosed in a sealed envelope, properly indorsed, in the very form in which it was presented to the court. It was delivered to the clerk by a judge of the election. This was a guaranty to them that it came from the judges of election — that it was a genuine and authentic return. It appeared, upon its face, to be properly authenticated by the judges and clerks of the election. On its face it was substantially regular and in compliance with the statutes concerning its authentication. There was not the slightest difficulty in ascertaining the result of which it purported to be a formal declaration.
Under these circumstances what was the duty of the can *658 vassers? The court below, in a preliminary proceeding touching the sufficiency of the petition, declared, as one of several propositions by which it proposed to be guided in the consideration of the case, the following: “ When a return is properly received, on its face substantially in accordance with law, it must be counted by them, though they may be satisfied that there was gross fraud in the election itself, or in the returns thereof as made to the clerk. [Judge Cox dissented as to the lines in italics.] And the court, in a prsceeding of this character, can only require the board to canvass such returns so received in this manner, and it can not, any more than can such officers, go behind the returns. All we can do.is to require it to do what the law requires of it.”
This pi’oposition is so well established by an unbroken line of authorities, that we deem it unnecessary to supplement it with citations. Under this rule, it is not easy to see where the canvassers could find a warrant for rejecting this return or any part of it. To do so they must have taken counsel of their suspicions, and condemned it for suspected fraud in the election or in the making up of the declaration of its result.
This would clearly require them to “go behind the returns.” This would require them to ignore that provision of the statute which commands that: “They shall not decide on the validity of the returns.” (Sec. 2981, Rev. Stat.) This would require them to condemn the return for “fraud in the election or in the returns thereof as made to the clerk.” It would require them to find as a fact, upon suspicion, or by presumption from the face of the returns, what, it is conceded by all parties, they would not be permitted to hear evidence to establish. We can not deal with this question more satisfactorily to ourselves than to submit, with our unqualified approval, what is said concerning this return by the member of the court below, Smith, J., who dissented from the action of the majority:
“Judge McCrary, in his work on Elections, sums up the law thus: ‘Section 81. It is well settle 1 that the du *659 ties of canvassing officers are purely ministerial, and extend only to the casting up of the votes, and awarding the certificates to the person having the highest number; they have no judicial power. In State v. Steers, 44 Mo. 223, which was a case in which the canvassing board had undertaken to throw out the returns from one voting precinct for an alleged informality, the court said: Where a ministerial officer leaves his proper sphere, and attempts to exercise judicial functions, he is exceeding the limits of the law, and is guilty of usurpation. And again: To permit a mere ministerial officer arbitrarily to reject returns at his more caprice or pleasure, is to infringe or destroy the rights of parties without notice or opportunity to be heard, a thing which the law prohibits. And so far, Judge Swiug, as I understand it, is of the same opinion, but thinks that, if the return on its face shows that it has been falsified by the officers of the election, or others, before it is received by the clerk, the rule does not apply, and he will state his views on this matter. But if the passages cited be correct statements of what the law is, it seems plain to me that the fact that upon the returns so made by a judge of the election in conformity with the statute, and purporting to be the return of the election board, and properly authenticated by it, there are appearances which would lead the minds of the members of the canvassing board to believe that the election board had committed great frauds in the conduct of the election, or had falsified the poll-books by the addition of a large number of names to the list of voters, and of tallies to some of the candidates, not representing real voters or ballots, even this would not justify it in assuming to decide that such return is, on such grounds, invalid, and to reject it, any more than it would if they were satisfied that there was fraud in the conduct of the election itself.
“The claim is made here that, in one such instance in this case, such a state of facts appear. I refer, of course, to Precinct A, of the Fourth Ward. And I am free to say that there is very strong ground to believe that in this pre *660 cinct the grossest fraud has been perpetrated, and it is, and it should be, the wish and desire of every honest man and good citizen that if it really be so, it should not be successful or avail to defeat the will of the people of the county as expressed by their ballots ; and most certainly, if I saw any way in which this court, in this proceeding, could properly and in accordance with legal principles interfere to prevent it, I would gladly do so.
“ Fortunately, however, there is a mode pointed out by our statute by which such wrongs, if they exist, may be righted. It may be that it is not an adequate or complete-remedy in every case, or in any case, but this is practically so as to every mode provided by law for the redress of injuries — but theoretically and in contemplation of the law it does afford an adequate remedy. I refer, of course, to the-proceedings authorized for the contest of an election; and as to this remedy, and the danger and impolicy of courts, assuming a jurisdiction as to matters of this kind not conferred by the statutes, the language of Judge Scott in deciding the case of Ingerson v. Berry, 14 Ohio St. 323, is pertinent and forcible.
“After directly affirming the right of the court in a mandamus proceeding to compel a canvassing board to perform merely ministerial duties, he says : ‘The importance, in a. government like ours, of preserving the purity of elections, and of ascertaining truly, and rendering effective, the will of the people, as fairly expressed through the ballot-boxes,, needs no comment. In the accomplishment of these purposes, the right of contesting all elections is, perhaps, the-most effective agency provided by law. The duty of making such provision is solemnly enjoined upon the legislature by the constitution of our state. Its language is:. The general assembly shall determine by law before what authority, and in what manner, the trial of contested elections shall be conducted. Article 2, section 21. And for-the efficient exercise of this right of contest, provision has at all times been made by the legislation of the state. This is the specific remedy provided by statute for the correction. *661 of ;t]l errors, frauds and mistakes which may occur in the process of ascertaining and declaring the true expression of the public will. This controlling policy may not be nullified by the courts of the state, but should be protected and cherished with the same sedulous care that the constitution and laws evince.’
“ If the board of canvassers assumes to decide that a return, properly filed with the clerk, and purporting to be the return of the election board, is invalid, for the reason that on its face there are evidences that it has sent up a false return, can this be a ministerial act? Is it not, on the contrary, clearly judicial ? It certainly involves the weighing of evidence for and against its validity, and the decision must be made in a case like that before the court, on. the knowledge the board or the court might have of handwriting, and by the comparison of one part of the return with another, matters about which persons might well differ — but on evidence of this kind alone, for no other is permitted, the board in the first instance, or the court in a mandamus case, would have to decide the question whether the election board has been guilty of fraud in the preparation of the return; for in my view the presumption of the law would be that the return in the very shape in which it now is, was signed by the judges and clerks of election at the close of the count, and duly sealed up by them and delivered to the. judge of the election, -who, in the same condition, conveyed it to the clerk’s office. Such is the plain requirement of the statute, and the presumption, unless the contrary is made to appear, is that they complied with the law in these respects — and in my judgment such canvassing board has no such power, nor has this court in a mandamus proceeding.” This reasoning remains unanswered throughout the entire discussion of this case.
Except a more experienced judgment, the court had no better means to judge of the validity of this return than the board. The rule that a court will not hear evidence in a mandamus proceeding, of any fact affecting a return which the canvassers are called upon to canvass and ab *662 stract, is universal. But one case lias been found which justifies such a proceeding. In The State ex rel. Metcalf v. Garesche, 65 Mo. 489, a court, in a mandamus proceeding, received evidence to show whether an alteration appearing upon a return was made before or after its delivery to the board; the latter being unable to determine the question. But as we say, this case stands alone.
It seems to' us, howevei’, that a convincing reason why the canvassers should have been permitted to count this return is to be found in the treatment which it received in the court below. No two of the judges entertained the same view concerning it. One was in favor of rejecting it wholly; one in favor of rejecting two hundred votes; and the third in favor of counting it entire. With this division of sentiment distracting the counsels of learned judges, it seems absurd to contend that it was so clearly the duty of these canvassers to reject it, or any part of it, as that mandamus is the proper remedy to compel such rejection.
This conclusion is supported by the following authorities.
In the case of the State of Iowa ex rel. Rice v. The County Judge, 7 Iowa, 187, the court decided under a statute similar to ours:
“ The duty of the canvassers of the election is not a judicial but a ministerial act, m the performance of which there is no discretion to be exercised. A board of canvassers of an election possesses no power or authority to judge of the validity of returns or of votes. The canvassers are only to receive the returns and to count them, leaving all questions as to their validity or deficiency to another tribunal.”
On page 199 the court used this language:
“Another point is that the duty to be performed is not a judicial one. It is ministerial. Neither is there, properly speaking, a discretion to be exercised. .In respect to this, there is a widespread error among the civil officers and among the people generally. It is not correct to suppose that a board of canvassers, such as the count}’ board in the *663 present instance, possesses the power or authority to judge of the validity of returns or of votes. This duty or power belongs to that tribunal which is appointed by law for the ultimate trial of contested elections, or to a court before which the case may he brought in any manner recognized by law.”
“ The true rule is „this : They must receive and count the votes as shown by the returns, and they can not go behind the returns for any purpose.” McCrary on Elections, sec. 82. The same author says, sec. 331: “ But the duty of declaring the result is a ministerial duty which the proper officers are bound to perform, and the performance of which may be compelled by mandamus, but they can not be directed by mandamus as to how they shall decide.” Hulseman v. Rems, 41 Pa. St. 396; Brightley’s Leading Cases on Election, 617; Slate v. Bailey, 7 Iowa, 403.
2. It is assigned for error that the court below excluded from the canvass the return from Precinct E, Ward 9.
There is no complaint that that part of the poll-book containing the names of voters was not in proper form and duly authenticated. But there was the entire absence of any writing upon that part of the poll-book known as the tally-sheet. There was no tally nor any statement of any vote given to any candidate, and it was not signed by any judge or clerk of the election. When the sealed envelope containing it was opened by the canvassers, they found inclosed in the tally-sheet and following the list of voters, a paper on the outside of which was the heading: “October Election, 1885,” and below the word: “ Candidates” were 'the names of the Democratic and Republican candidates for the state, county, and township officers, and opposite each name and below the heading “ Tallies.” appeared in figures a number purporting to be of the votes cast for him. On the outside of this paper there is the following indorsement: “October Election, 1885, Ward 9, Precinct E ; polling place, Engine-house, Sixth, near Vine.”
“We hereby certify that we have compared the above *664 totals with the tally-sheet, in the-"Ward, Precinct-, and they agree.”
This is signed officially by the three judges and the two clerks of the election in the precinct indicated upon the paper. On the last leaf are four printed instructions “ to the person having this return in charge,” as to procuring the judges and clerks of the election tp compare the totals marked on this return with the tally-sheet, and certifying that they agree, etc. — the same, when completed, to be placed in an envelope, sealed up, and delivered to the Duckworth Club, No. 51 West Ninth street, on the night of election. Upon its rejection the judges below were.all agreed. By the opinion of one of them it is apparent that the matters upon this paper, aside from that which indicates the aggregate vote for each candidate, and the certificate of the judges and clerks, exercised an important if not controlling effect in its rejection. It is agreed by all the counsel in the case that tally marks indicating the number of votes received by each candidate are not vital to a sufficient return. The numbers may be expressed in figures or words. The printed form of the poll-book prescribed by the statute contains this form, of certificate at the foot: “We do hereby certify that A: B. had -votes for governor, ,C. D. had -- votes for governor, etc.,” to be signed by the judges and attested by the clerks.
The blanks are to be filled with figures or words indicating the aggregate number of votes received by each candidate voted for. Section 2962 Revised Statutes provides that “ no election shall be set aside for want of form in the poll-books, provided they contain the substance:”
Now let us consider this paper, divested of every thing upon it except what tended to show the result of the election, and the certificate of the election officers. In that condition, it would be almost entirely free from the supposed infirmity which seems finally to have induced its rejection.
By a familiar principle, it was the duty of the canvassers to reject as surplusage all matters which did not tend to *665 show the result of the election.. “If other matters are introduced into the return than those which the law provides, they are to that extent unofficial and unauthorized, and must be disregarded.” Cooley’s Const. Lim.*622.
“ Such returns are valid only so far as they are confined to the facts which the inspectors are required to set forth, and if they go beyond these and state others, such statements will be treated as mere surplusage.” Ex parte Heath, 3 Hill (N. Y.) 43. It was to be considered by the canvassers, then, as if divested of matters which did not tend to show the result of the ballot.
The returns, including this paper, were delivered to the clerk by a judge of the election in a sealed envelope duly indorsed, as the returns of the election in the precinct' indicated.
There is no claim of fraud or other infirmity affecting their validity or sufficiency, except that it is defective in form.
There is no claim that the result indicated was not the true one.
The aggregate number of votes indicated upon it corresponds to the number of names of votes upon the poll-book. Coming to them as it did, the canvassers could have but one opinion concerning it — that it was transmitted to them by the election judges as an intended declaration of the result of the election in their precinct. It is said that it appears upon its face that it was not intended to be sent to the canvassers; but the fact remains that it ioas sent to them as a return. After this return was opened, and its imperfect condition discovered, the canvassers procured the judges to reassemble, and in their presence they completed the tally-sheet with tallies and footings, and having duly authenticated it, as did the clerks of the election, the returns so completed were delivered in due form to the clerk. and canvassed by the board. As there is not a majority of the court of one view upon the effect of this proceeding, we prefer to consider the return as in its original form. It w.as evidently pre *666 pared in much haste, and evidences inexcusable neglect and disregard of duty by the election officers. Upon this feature of the question the supreme court of Maine has said, as cited in McCrary on Elections, sec. 554: “ The official returns required from the municipal officers of the several plantations, towns, and cities, are and will be made by plain people, and made, too, in the hurry and bustle and excitement of an election. . . . It is enough if the returns can be understood, and if understood, the full effect should be given to their natural and obvious meaning. They are not to be strangled by idle technicalities, nor is their meaning to be distorted by carpings and captious criticisms. When that meaning is ascertained, there should be no hesitation in giving it its full effect.”
Morton, J., in Strong, Petitioner, 20 Pick. 492, says upon the subject of imperfect returns: “Shall the whole town be disfranchised by reason of the fraud or the negligence of their officers? This would be punishing the innocent for the faults of the guilty. It would be more just and more consonant to the genius and spirit of our institutions to inflict severe penalties upon misconduct, intentional or accidental, of the officers, but to receive the votes whenever they can be ascertained with reasonable certainty. ... If the record, and the return, which is a copy of it, shows the whole number of ballots, the names of the persons voted for, and the number of votes given to each, it contains every thing that is material, and if duly authenticated, may safely bo received as a valid return, in whatever form it may be made.”
The canvassers were called upon to say whether it was a return.
They wore called to the exercise of their intelligence, sense, and judgment in determining this fact.
Looking to its substance, rather than to its form, would any ordinary man hesitate in determining what its meaning was, and that it was a reasonably intelligible indication of the number of votes received by each candidate at the election in the precinct named ? We are not called upon *667 here to say whether this is a legal return. We must be able to declare it an absolute nullity — a thing utterly void of all matter of substance, and that there is nothing in it, or of it, to invoke the judgment of the canvassers as to whether it was a return. It is not so clearly a nullity as that a court would be justified in ordering the canvassers, by mandamus, to count it out, and thereby utterly disfranchise the voters of the precinct. The court erred in ordering its exclusion from the count. The rule is fundamental that the law will, so far as may be, without doing violence to the clear legislative intent, so construe election laws as to avert the disfranchisement of the legal electors of a precinct through the ignorance, neglect, or fraud of election officers.
3. It is assigned for error that the court excluded from the count and abstract certain returns, which were not delivered to the board by one of the judges of the election.
The return, which is chiefly the subject of contention upon this ground, was delivered by one of the clerks of the precinct, and received by the clerk in the belief that the person delivering it was one of the judges of the election. It was so'indorsed on the envelope, and the clerk delivering it signed the indorsement as judge of election. This was opened and abstracted by the board in the presence of all in attendance without objection from any one upon this ground. There was no question that it was not a genuine return. The first discovery that the person who delivered it was not a judge of election was made upon the trial below. There is not a word of complaint in the amended petition that the canvassers were abstracting returns not delivered by a judge of election ; yet against the objection of the defendants below, this precinct was counted out by the court with three others on the same ground.
We deem it important that in a matter involving the utter disfranchisement of the legal voters of four entire precincts, there should be something in the petition for mandamus to set the court in motion. No issues having been joined involving these returns, and there being no claim but that they truly reflected the choice of the electors of *668 the precincts they represented, there was not sufficient warrant for their exclusion.
4. In the returns from a large number of precincts, there was shown to be an excess of votes as indicated by the tally-sheets over the number of names of voters appearing upon the poll-books. Where the excess was less than ten they were counted. Where more than ten they were deducted from the two parties in proportion to the vote of each. By this rule a net excess of 82J votes was deducted from the Democratic can didates.
The general election laws provide that the election judges shall count out from the ballot-box the number of ballots corresponding to the number of names on the poll-books, and no more. Section 2928 (Rev. Stat.), which relates to elections in Hamilton county, provides that each ballot-box shall be provided with a device for stamping each ballot deposited in the box. It further provides that “ all ballots found in such box that are stamped, shall be counted, and no ballot therein shall be counted unless stamped,” with no express limit upon the count of votes to the number of names appearing on the poll-books.
The stamp seems to be intended to authenticate each ballot deposited in the box as genuine.
The only means provided for indicating .upon the returns the number of votes cast, is by the tallies or numbers upon the tally-sheet.
The statute provides (Sec. 2981 Rev. Stat.) that the canvassers : “ In making the abstract of votes shall not decide upon the validity of the returns, but shall be governed by the number of votes stated in the poll-books.” The record of each vote is presumed to represent the choice of a voter, and is to be counted.
That the power to adopt a rule for the counting out of an excess of votes indicated by tallies or numbers over the number of names upon the poll-books was never intended to be vested in the canvassers, seems to us to be placed beyond serious controversy by the reasoning of the member of the court below, Smith, J., who dissented from the ex- *669 elusion of this excess of votes. He says in his dissenting opinion : “ It could uot have been the purpose of the lawmakers to lay down a rule under which a board of this character, established to do simple ministeral acts (as the decisions quoted distinctly establish), with no power to hear the testimony of witnesses, would be frequently called upon to decide some of the most delicate and difficult questions, and about which a court of the highest authority, and with power fully to investigate it, might well hesitate as to the proper course to be pursued in a given case.
“ If such had been the intention of the legislature, is it not probable that it would have given explicit directions as to the exercise of such power — as to what should be done by the board if the votes returned to the candidates for a particular office exceeded in number the names of those voting at the election — whether to reject the whole return, or deduct the excess from the different candidates in some particular way — or if the whole vote was to be rejected, when such excess was so great as to be indicative of fraud, how great such excess must be to raise such presumption? The fact that nothing of the kind was done is a cogent reason for the belief that if was never intended that such power should be exercised.”
We conclude that the coui’t erred in deducting this excess, but we have more to say upon this branch of the case in another connection.
5. The. returns from Precinct E, Ward 18, were excluded by a majority of the court on the ground that they were not delivered to the clerk or canvassers until after the canvass had begun.
The record shows that these returns were tendered to the clerk by a judge of the election in that precinct before the canvass had begun, but the clerk refused to receive them for the reason that they were not inclosed in a sealed package. Taking the advice of the city solicitor, a mandamus proceeding was resorted to to compel the judges of the election to seal up and deliver them according to law.
This caused delay, so that when the writ was finally *670 obeyed, the board had commenced the canvass. "We are all of the opinion that, while it was the duty of the election judges to trausmit the returns to the clerk in a sealed envelope, yet, as they were the true returns, and their delivery was tendered to the clerk by an election judge, he could receive them, and the electors of the precinct were entitled to have them canvassed and counted.
6. That mandamus will lie to enforce the performance of an act which the law especially enjoins as a duty upon a public officer, where its performance is refused, is very clear. And if the canvassers are neglecting and refusing to perform a duty which the law expressly imposes, there is no doubt that mandamus may be invoked to compel performance.
So, if a canvass had proceeded so far that it became apparent that it was the plain duty of the clerk to issue a certificate of election to a particular legislative or other candidate, his arbitrary refusal to issue it would justify the interposition of a writ of mandamus to compel its issue. If the canvassers refuse to proceed with their appointed duties, mandamus is a proper remedy to set them in motion. There is nothing in this rule, however, to authonize a court to do more than to command the performance of such neglected duty. An application for mandamus can not be construed to invest a court, whose action is invoked, with power to bid the canvassers stand aside, to take their places ? and perform their duties for them. It is not within the resources of the law to equip a court for the duties of a returning board. That the attempt to do this is destined to lead to vexation, complication and delay, is abundantly shown by the record before us. Under the supposed authority of the application for mandamus, the court proceeded to the canvass of the two hundred and six precincts of Hamilton county, and to determine which candidates were elected, so that at the conclusion of their protracted labors they were prepared, from an abstract of the entire vote of the county, made according to their canvass, and incorporated in the entry of the judgment, to make a dec *671 laration of the result, and of the election of certain candidates, so that nothing was left to the canvassers and the clerk but to approve the canvass which the court had made, copy the abstract of the court, and issue certificates to the candidates whom the court had judicially determined to he elected. In announcing the result, the presiding judge, speaking for the court, says: “ The result, according to our calculation, will be as follows for the respective candidates for senate.” Then follows a statement of the exact number of votes cast for each candidate, followed by: “And the canvassers will accordingly be ordered to canvass, count, abstract, and certify the votes for senators according to the foregoing result.”
In approaching the accomplishment of this result it became necessary, in a preliminary proceeding to test the sufficiency of the amended petition, to lay down several fundamental propositions by which the court was to be guided in canvassing the returns. Upon a vital proposition in the ease, regarding the duties of county canvassers, there was a radical disagreement between the members of the court, one of whom filed a vigorous dissenting opinion. Still another important proposition involving the duties of the canvassers was left undetermined, and suspended in uncertainty (by reason of the difficulty attending its solution), to be determined upon the final disposition of the case. Pending the consideration of the case, the opinions of at least one member of the court, as announced in his dissenting opinion, experienced a radical change concerning important duties of a canvassing board. After nearly six weeks of patient, constant, and devoted endeavor, aided by eminent counsel, to ascertain and perform the duties of the canvassers, we find the court almost fatally divided upon vital questions in the case.
The judge delivering the opinion of the court, says, concerning one of the returns under consideration : “ The whole paper bears such evidence of fraud that it should be rejected in toto. One of the judges is of the opinion that only two hundred votes should he taken from the Demo *672 cratic candidates; and another is of the opinion that the whole must be counted. Under this condition of views, as my own as to the rejection of the whole is not concurred in, I must accept the nearest to it, and concede the rejection from the Democratic vote in this precinct of only two hundred votes.” Thus we see that but for the reluctant surrender, at the last moment, of stern convictions of duty by one of the eminent judges of the court, the finding and order which was finally made by a majority would have been impossible.
At the conclusion of their labors we find each member of the court in his turn dissenting from some of the couclu-, sions of his colleagues. Indeed, the entire record and judgment is clouded with almost hopeless doubts and difficulties, which seem to have attended the best efforts of a court eminent for its learning and ability to ascertain, declare, and perform the duties of this canvassing board. Nor are we able to find compensation for all this uncertainty in the cheerful declaration of one of the three dissenting judges of the court below, that: “Our election laws are plain, explicit, and easily comprehended,” etc.
It should be kept in mind that by the firmly established law of our state, it is only where the canvassing officers are refusing or neglecting the performance of a plain duty which the law has especially enjoined, that mandamus can be invoked to command performance.
The necessary theory of the case below was that these canvassing officers were subject to the plain duty of doing-the very things which the court finally ordered them to perform, or proceeded to perform for them.
It is maintained by counsel that in neglecting the performance of these acts the canvassers were guilty of a great wrong to the state and to the people of their county. Is it true that these canvassing officers, being but plain men, wholly unused to and unlearned in the rules of statutory construction, are bound to foreknow what may be the compromise judgment of a divided court concerning their duties, after a patient and laborious investigation of nearly *673 six weeks — must they foresee all this at their peril, or be held as public enemies ?
Surely, the law imposes upon these officers no test of duty so harsh and unreasonable as this. The hardship of such a test is strikingly illustrated by the action of a majority of the court helow in its treatment of the excess of votes returned, as shown by the tallies and footings, above the number of voters named in the returns. The action of the court is fully shown by the opinion of the presiding judge: “ In examining the returns we find that in most of the wards there is an excess of votes over the number of voters. This excess runs from one to forty-two votes. When the excess of votes was less than ten, we have not taken it into consideration, but where more than that number, we have divided them proportionately between the two parties. In the Nineteenth Ward, Precinct D, the excess is forty-two votes in 244 total, great enough to show fraud, and if it affected the general result, we would be disposed to reject the whole return, hut as it does not, we divide proportionately, as the others.”
The warrant for the proceeding below — for the use of mandamus as a remedy — is found in sec. 6741 (Rev. Stats.): “ Mandamus is a writ issued in the name of the state, to an inferior tribunal, a corporation, board, or person, commanding the performance of an act which the law specially enjoins as a duty resulting from an office, trust, or station,” Where these canvassing officers would be able to find the law which specially enjoined upon them the duty of making this disposition of these excessive votes has not yet been revealed to us. Yet the court announced that: “All we can do is to require it (the board) to do what the law requires of it.”
We must not forget that the court was not trying an election contest (at least not in legal theory); nor was it considering a petition in error to review and correct the action of the board. It was simply called upon to order the board to proceed to the performance of a plain duty “ which the law specially enjoins.”
*674 It will be seen by the quotation from the opinion last cited, that it is declared to be the duty of canvassing officers to count out all over ten, and count in all below ten; leaving the exact exqess of ten unprovided for. But why ten? Why not fifteen, or five ? Then the majority of the court say that the excess of forty-two in one precinct is large enough to show fraud; “ and if it affected the general result we would be disposed to reject the whole return, but as it does not, we divide it proportionately as the others.” If the court was justified in this action, it was for the reason, and only for the reason, that it was a duty specially enjoined by law upon the canvassers so to do. Under this rule the canvassers of the state are to count out a precinct where it would affect the result, and count it in (except the excess) where it would not. Are they to await the entire canvass of the county, or (in case of a close contest for state officers), to await the entire canvass of the state,in order to determine whether the law specially enjoins upon them .the duty of counting it in or counting it out, according as the general result is to be affected by it ? And in case of such excess in several counties, which board is to await the result of the canvass by the others, in order to determine how the general result is to be affected by its performance of duty? And if this is to stand as a judicial determination of the duty of canvassers, will a writ of mandamus lie to command them to count a precinct out or in according as it may affect the general result? If not, neither can the court. It will be seen that this question assumes grave • importance in this controversy, when it is known that the excess involved in controversy is sufficient in itself to determine at least one of the cases before us.
It is idle to urge that these canvassing officers are not prejudiced by this error of the court. They are not interested in this case except to know their duty. This proceeding is in the name of the state, and every voter in it is prejudiced by an erroneous declaration of the law concerning the duties of those officers who are charged *675 with, the responsible trust of ascertaining their will as expressed through the ballot box.
We are invited by counsel for defendant in error to consider the judgment and order of the court below in the light of, and as explained by, the opinions of the judges. They are before us. The third proposition of the syllabus is :
“When the tallies on a return are in excess of the number of votes on the poll-book, the canvassers should, if sufficiently large to show fraud, and change the result of the election, throw out the whole precinct; or they may divide the excess among the candidates of different parties proportionately, according to the rules laid down in McCrary on Elections, secs. 298, 299, 300.”
It will be seen that this leaves with the board the choice of several rules for the disposition of the excess. Upon what principle may a court command the board to adopt a particular rule when several are within its choice?
If this be the law for the canvassing boards of the state, it condemns them to the consideration and determination of questions concerning which the learned court below, in its first declaration of principles, said: “But inasmuch as great doubt exists as to what the law requires of the board in such a case, that is, whether the whole vote and returns should be rejected, or if canvassed, in what manner it should be done, we do not now finally dispose of this question, but reserve it for further consideration.”
But if the duty which the law specially enjoins upon canvassing officers be as above declared, we find them invested with vast discretion concerning a question which has almost fatally vexed and divided one of the ablest judicial tribunals of the state.
That mandamus will not control the discretion of public officers is too firmly established for serious discussion.
“ It is too well settled by reason and authority to admit of denial, that the lawful discretion vested in an individual, officer, or corporation, can not be destroyed or limited by the writ of mandamns.” Ex parte Black, 1 Ohio St. 37.
*676 “Where it is the duty of a board to exercise its discretion, and it refuses to act, it may be compelled to do so by mandamus; but the writ can not be used to control the discretion of the board.” Comrs. Lake Co. v. Comrs. Ashtabula Co., 24 Ohio St. 401.
“Where a public officer is called upon to perform a plain and specific public duty positively required by law, ministerial in its nature, calling for the use of no discretion, nor the exercise of official judgment, his performance of such duty may, upon his refusal and in the absence of other means of relief, be enforced by mandamus ” State ex rel. Insurance Co. v. Moore, 42 Ohio St. 103.
“The rule is that in all matters.requiring the exercise of official judgment or resting in the sound discretion of the person to whom a duty is confided by law, mandamus will not lie, either to control the exercise of that discretion or to determine upon the decision which shall be finally given.” High Ex. Rem., sec. 42.
In The State v. Foster, 38 Ohio St. 599, it appeared that Henry L. Morey was a candidate for representative in congress from the seventh district of Ohio, in one of the counties of which the votes were all cast for H. L. Morey. Mandamus was invoked by Campbell, his competitor, to compel the board of state canvassers to count the votes for Henry L. Morey and for H. L. Morey for different persons. It was not averred that the votes were intended for different persons. The writ was refused. White, J., in his opinion, approved the language of Judge Cooley in his work on Constitutional Limitations, 623, that: “ The action of such boards is to be carefully confined to an examination of the- papers before them, and a determination of the result therefrom in the light of such facts of public notoriety connected with the election as every one takes notice of, and which may enable them to apply such ballots as are in any respect imperfect, to the proper candidates or offices for which they were intended,” etc. Concluding his opinion White, J., says: “ The relator relies upon the case of Clark v. Board of Examiners of Hampden County, 126 Mass. 282, *677 in which it was held that mandamus would not lie ‘to compel the board to count certain votes containing the initial letter only of the Christian name of a candidate with other votes containing his name in full.’ But it does not follow that, had the board determined to count the votes instead of to exclude them, they would have been compelled by mandamus not to count them.” The logic of the case is that the court would not undertake to control the action of the board, or compel it by mandamus to act in any particular manner concerning the counting of these votes — either to count them for the same person or to count them for different persons. The board was so far called to the exercise of its judgment, sense and intelligence, as that mandamus will not control or direct the manner of their exercise. The case strongly supports the principle contended for.
But if the court is right in the proposition last cited, we are invited to approve the novel proposition that mandamus will lie to compel the plain men who are called to the duties of canvassing officers to construe and execute the election laws of the state according to McCrary on Elections; while it is most probable that a large majority of them never heard of Mr. McCrary. Consulting, however, the sections of McCrary on Elections to which the court refers, we find that the subject there under discussion is, as its title indicates: “Practice and Evidence in Contested Election Cases.”
"We find here three rules for election contests concerning excessive votes. Of course, in cases of contests, the election, returns and canvass may be purged of every taint of fraud, crime, neglect or mistake, from the deposit of the first ballot to the final declaration of the result.
No rule was intended or attempted to be prescribed in the sections cited for the guidance of canvassing officers. To grant to returning boards the powers possessed by courts and other tribunals in the trial of election contests, and compel such boards by mandamus to exercise them, would *678 utterly destroy a policy whose wisdom is proved by experience.
It should be observed that the eminent judges of the court below proceeded with their investigation under a strong suspicion that behind at least one of the returns before them, or in its preparation, there was fraud if not crime. As already indicated, we share in that suspicion. We say, with Smith, <T., the dissenting judge below, if we “ saw any way in which the court, in this proceeding, could properly and in accordance with legal principles interfere to prevent it, we would gladly do so.” He is neither a good citizen, nor an honest man, who will look in silence upon the perversion of the popular will as expressed through the ballot-box, or who would willingly leave any lawful means unused to detect and expose the wrong'.and bring the offender to justice. It will be seen, however, upon the slightest reflection, that it is fortunate for us all that the remedy for frauds at the polls does not rest with these canvassing officers; and if not with them, it follows that it is not with the courts, in a proceeding whose only office is to move them by mandamus, to the performance of their duties. To clothe these officers with the powers which the court assumed to exercise in the effort to find a remedy for what it conceived to be a great public wrong, would be little better than a calamity. These officers are not equipped for the consideration and determination of the intricate and vexatious questions which chiefly engaged the attention of the court below, and which involved it in almost fatal division and dissension. Nor are these divisions to be accounted for upon the flippant and convenient suggestion of political differences.
Seeking for a remedy within the limited powers of the canvassing officers, it was confronted by its own clear declaration of the law, made at the outset of the trial, that when a return is received by the canvassers, “ on its face substantially in accordance with the law, it must be counted by thorn, though they may be satisfied that there was gross fraud in the election itself, or in the returns thereof as made to the clerk. *679 And the court, in a proceeding of this character, can only require the board to canvass such returns so received in this manner, and it can not any more than can such officers go behind such returns. All we can do is to require it to do what the law requires of it.” They were confronted by that plain provision of section 2981, Revised Statutes: “And in making the abstracts of votes they shall not decide on the validity of the returns, but shall be governed by the number of votes stated in the poll-books;” and by the following declarations of this court. In Ingerson v. Berry, 14 Ohio St. 822, by Scott, J., that: “The aggregate results of the returns, exhibited by the several poll-books, are to be ascertained by arithmetical calculation, and can not be controlled by the discretion of the persons performing the duty. Such counting of votes, making of abstracts, which exhibit the result, and giving certificates accordingly, are duties which fall within the province of a clerk and accountant — they admit of no discrectiou, and are in their nature ministerial.” And in the same case, that a contest on appeal “ is the specific remedy provided by statute for the correction of all errors, frauds and mistakes which may occur in the process of ascertaining and declaring the public will.”
In Beck v. Weddell, 17 Ohio St. 271, that allegations of fraud and illegality in conducting an election, constitute no sufficient ground for an injunction ; and that wrongs of such a nature can be inquired into and i’edressed only by means of a contest of the election.
In Phelps v. Schroder, 26 Ohio St. 549, that “where the poll-books upon their face are substantially correct, the justices and clerk, in making the abstract of votes, are not authorized to reject such poll-books on account of fraud in the election.” In this case it was known to the canvassers that the returns were reeking with fraud, in that they represented eighteen hundred fraudulent votes in a precinct containing not more than twelve hundred legal voters. The canvassers rejected it. The *680 court say: “We are all of the opinion that the action of the clerk and justices in rejecting the poll-book and vote of Perrysburg township was wholly unauthorized and illegal.”
In the light of the manifest policy of our law, as reflected by the foregoing, the court found it necessary at the conclusion of its labors to record a judgment, born of doubts, dissensions, and compromise, and which confessedly does not reflect the real convictions of any two of its members, and then to order that a writ of mandamus issue against these canvassing officers commanding them to adopt it as their own and carry it into execution!
But, fortunately for us all, there is a complete and adequate remedy, and a sure and safe refuge from all this doubt and complication, in the constitution of our state, which has wisely ordained (section 6, article 2), that: “Each house shall be judge of the election, returns and qualifications of its own members;” and in the statutes enacted to effectuate its salutary provisions, by which section 8003, Revised Statutes, “The right of a person declared duly elected to the office of senator or representative in the general assembly may be contested by an elector of the district or county, by appeal to that branch of the general assembly to which such person is declared elected,” etc.
The jurisdiction of each house to decide upon the election, returns and qualification of its own members is supreme and exclusive. Cooley’s Con. Lim. *133; State v. Jarrett, 17 Md. 309; People v. Mahaney, 13 Mich. 481. No court of the state has, nor is it possible under our present constitution, to clothe any court of the state with the power to decide upon the validity of the returns of the election of any candidate for either house, or to decide him elected or defeated.
The judgment of the court below recites that: “The court further find that the said James C. Richardson, Amzi McGill, Frank Kirchner, and George W. Hardacre have a plurality of all the votes cast at said election as aforesaid and have been duly elected to the office of senator to the gen *681 eral assembly of the state of Ohio from said county of Hamilton, and each of them is entitled to have a certificate of election issued to him for said office by said defendant, Daniel J. Dalton, clerk as aforesaid.”
This supposed adjudication is a nullity; being wholly without the jurisdiction of the court.
In a contest in either house the broadest range is given contestants to purge the ballot and returns of the consequences of neglect, mistake, fraud and crime, from the opening of the polls to the final declaration of the result, and no more forcible illustration of the wisdom of this policy can well be conceived than the proceeding now before us for review.

Judgments reversed.

Johnson, J., dissents from the judgment in all the cases involved, except that of Dalton v. The State ex rel. George W. Hardacre.